Where MasterCard In Question is Located Case number 162286, White Knuckle Gaming vs. Electronic Arts. Mr. Hanson, whenever you're ready. May it please the court. My name is Andrew Hanson and I'm representing White Knuckle Gaming. The sole issue before the court today is whether the district court erred in finding the claims of the 575 patent to be ineligible subject matter. The district court erred at both steps one and two, and so either of these errors would be grounds for reversal. Your honors, the appealed claims of the 575 patent are directed to an improvement in the simulation of sports video game characters. The patent describes a problem with the realism of these sports video game characters, and video gamers were frustrated that their video game characters didn't represent what was happening in real life. The patent seeks to solve this problem at column two lines 23 through 26. That's appendix 117. It says instead of playing with last season's teams, video gamers get a chance to play with the power. The appealed claims recite specific structure for accomplishing that improvement of improved simulation of video game characters. In fact, reading from the claims, column eight lines 36 through 40, each of the updated video game character performance parameters in the series is based at one or more different real life performances of the particular real life sports athlete in one or more sporting events performed during the single sports season. Your honors, this limitation is a meaningful limitation that it takes information, what was sports, how players perform in real life, and it converts it into, it changes its character into a parameter, and then that parameter is used in the video game simulation to create a new video game, one that has the benefits of simulating what's happening in real life. This claim, these, the claim, I think the best example of a case where the facts are similar is probably McGrow and possibly Enfish. In McGrow, it was, they were, the case related to creating realistic facial features in a simulation of a 3D facial expression, and the court there found that because the morph weightings, which are rules, had an effect on how the facial features were created, that that was a problem rooted in the software itself, and that's the case here. The claims are directed to this performance parameter that improves the effect that the parameters are during the season, and they're based on real life, or different performances of real life athletes, creates a different video game with benefits that users found enjoyable and overcame their frustrations. The district court oversimplified the claims and held that the claims were directed to nothing more than updating a software in a sports video game. This fails to consider the claims as a whole. For instance, the court didn't address the performance parameter aspects of the claim, and we think that that's a clear error for reversing. The court also, or Electronic Arts, cites several cases to support the idea that updating sports video games is abstract, many of them which are this organizing, gathering, and displaying information. Your Honors, this patent is not similar to those cases because the information that's in these parameters is used to cause a transformation or create a different video game that has a different kind of simulation. Is there a technological difficulty associated with updating this information for a given video game character? Yes, Your Honor. I think that there is a technological difficulty in configuring the video game in a different way so that it can be updated. The way the background describes the prior art is not that video games were updated, it's that video games were produced. So the way it worked was that every year, a video game company would produce a new video game, and when they're making that video game, they have to select the parameters.  So the improvement here, I understand, is the updating, is it of a database or a table in order to update a particular character's statistics, or make that character, maybe a rising star, become more of a rising star in the video game, right? So it is difficult once the video game's been created and mailed and shipped out to the end user, it can't be updated. I mean, it's not that it's difficult, it's that it can't be done. Those video games, once they were sent... You're saying in the prior art, it was not... The prior art... Yes, I'm sorry. The prior art video games were not... There's no evidence on the record, at least, that those prior art video games were capable of... Where in your claim is the problem solved? Where does it get into the technical discussion of how the problem of, you know, before games could not be updated, now you've come up with this solution. So that games could be updated. Where is that in your claim, other than more generally stating that it's going to be updated? Yes, so the... I think you're referring... The general statement I think you're referring to is in the updating step in, like, lines 44 through 47-ish. So that is a desire for an end result, but... Where's the switch, please? I'm referring... The end... The result-oriented language in the claim is found in column 8, lines approximately 44 through 47 or 48. We would agree that that's an end result. In other words, you're saying that it says, such that the particular video game character more closely simulate real-life performance attributes. But it's all the language that comes... You know, there's approximately 30 lines or so above that, and there's meaningful elements of this claim where you have, for instance, in the loading step, you have individual video game characters that are associated with the performance parameters. So when you change those... When you use a series of parameters that change those characters, it's that combination of elements that creates the real-life simulation. And so... But the prior art had video game characters associated with particular real-life sports athletes. Correct. That's in the prior art. The point of novelty is updating those... It's the updating step. That's the point of novelty as I understand it. And I'm wondering, you know, please help me to understand how, what the technological improvement here is, more than just the general idea of updating the information about particular video game characters. So, no, Your Honor. Respectfully, I would disagree that it's in the updating step that the improvement happens. It's in the... It's in the... You know, it's claimed indirectly in the receiving step, but the receiving step is what defines what the parameter is. And so, it says that... Right. Let me just focus. So, in the background, in column one. Correct. It says, this is all part of the prior art. Video game characters have characteristics approximating their real-life counterparts. Video game Shaquille may be very good at dunking... Video game Shaquille may be very good at dunking the basketball, but horrible at shooting free throws. Parameters are stored on the video game medium that cause the different characters to have real-life counterparts' performance. So, even that seems to me to be saying that the internal organization of the video game is one that at least includes a set of parameters stored that say Shaq does this, and LeBron does this other thing, and so on. So, now, what is it that this claim is doing other than saying, update those parameters? So, we get today's Shaq. Today's, not probably not today's Shaq, but today's LeBron. So, your honor, if you look in column one, in lines, let's see. It's pro... Barry Bonds, it's line 26. Barry Bonds of the San Francisco baseball team had a home run average of 73 home runs during the 2001 season, and they're saying, this average can be used to set a video game parameter. So, it's the season average. It was, you know, this language shows that it's the season average that shows what you used in those previous video games. And so, our position is that... I thought I heard you suggesting earlier that it wasn't just that there is a database of things that are marked, and they're getting updated, that this does more than that. This is actually somehow configuring the video game so that suddenly the parameters are structurally separate in the video game, and therefore, able to be changed without changing the rest. You don't need to redesign the whole video game. Correct. That's what it seems to me column one is running counter to. So, your honor, I see that I'm almost out. I'd like to reserve some rebuttal time, but I really want to answer this question. Please. Succinctly, an average statistic is not the same thing as a series of parameters. If you take a season average, which is what it says to do here in the background section, and you put that into a video game, you are stuck in the last season. The claims require a series of parameters for each character, a series of parameters that are based on different performances. And if you use a parameter like that, that's a very different parameter than a season average. And it produces a different result, one that solves the problem that was found in the prior record. Okay. Thank you. We have three and a half minutes left. James Martin. Good morning. The problem with the patent here, looking at claim one, the representative claim and beyond, is that it lacks any detail showing a technological innovation, a change to the computer, computer itself, computer technology, software technology. It is simply a temporal patent that addresses providing updates that had been provided previously more frequently. If you go through the claims, there are no details whatsoever on the how, the thing that this court has identified as leading to abstract ideas in step one and the lack of inventive concept in step two. Can I interrupt you for one minute? I think this is a bit of an aside, but you had said that this had been done previously, though not as often as you think this patent might contemplate. That's not in the record before us on 12B6. Well, Your Honor, it is in the sense that the patent provides that annual updates of current performance statistics had been provided year over year in the prior art. Wasn't that by buying a new game, or was it by download? It was, but in other words, the concept of updating using performance statistics. I had an or question. I said, is it by buying a new game or updating? And you said it was. Which one was it? Oh, okay. It's by buying a new game. Yes. Okay. But the concept was there. All we are saying now with the 575 patent is do that same function or do that same statistical change more frequently. But without... And deliver it differently? No, that's what's not in this patent. That's the problem here. There is no how. There's loading, receiving, transmitting. The parameters are not dynamic. They are described as data. So it is simply a data transferring mechanism with a direction to use a computer and the faster. But it is, in that sense, without the how, we don't have the advancement in the technology or the change in technology which is required to get this beyond the abstract and into an inventive concept. So presumably what you're saying is one of the ways this works is you have a baseball game. You have a particular player based on the previous season. That player has a batting average for game purposes of 320. That's what you start with in April. Then the end of June, the player's not playing as well. His current average is down now to 260. Something gets sent. Is that the idea? Well, apparently something gets sent. There's no how. You're saying the problem... That's the concept. But you're saying there's no indication here of how it's implemented. Right. The representative claim describes loading video game data, which includes rules and parameters, receiving updated parameters, and then updating the video game with updated parameters. The new parameters are recorded on a server and a video game player can connect to the server. The video game machine itself is described as an ordinary computer. Now, there is nothing about configuration in this patent, despite what counsel has argued. The claims say that the game medium is configured to cause the game machine to perform a method, including receiving updates. All of this is purely functional language with no indication of an improvement in computer related technology. You're saying in the claim it's purely functional and the specification doesn't provide... The specification doesn't provide any additional detail. It still talks about data. In fact, in the district court, counsel was invited to point to where in the specification there was a technological concept changing the computer itself or changing something about the software itself. It's not there. The patent, in fact, doesn't claim anything dynamic. It claims parameters, and parameters in the patent are data. So there's nothing novel also about an updating process. Books get updated all the time. Treatises get updated all the time. The federal rules get updated all the time, and sometimes supplements come mid-year. So there is nothing novel about an updating process itself. What would be needed here is the change in computer technology that would push this information on an updated basis to the game user. That's what we're looking for, and that's what's missing. That's the difference with the McRow case, where there was a specially defined set of rules that produced the change. You will search this patent in vain for any special rules that relate to computer, the technology. What we end up with is an abstract concept of sending, transmitting data more frequently using a computer, routine components, and no inventive concept attached to it, because there is no how on how all this is done using technology. Unless the court has further questions, we'll submit. Thank you very much. Mr. Hanson. Looks like my time is short. I'll be brief. The patent does, I just want to address the issue of whether the patent describes technical features that solve the problem. Figure 9 on appendix 111 describes the game engine, and there's text related to that. And figure 6, I believe it is, that has RAM with the parameters. It shows the configuration of the parameters. These are elements of the patent that describe the features that they say are missing from the patent. I would like to, I think it's helpful to give somewhat of a hypothetical. If you were to take the background section, what it describes as the prior art being video games, and you were to add the internet to it, all you would get is a video game that had the previous season's average, and it would be accelerated. The game wouldn't function any differently. It would still be stuck in the past, and it would still lack the excitement of having a video game that represents real life. And I think even here today, EA, again, fails to address the performance parameter limitations. These are the claims actually recite specific features of those parameters, and those parameters are a rule, if you will. It's saying that the parameters are received during the season, that they're based on different performances of an athlete, and those features are taught nowhere in the background section of the patent. The concern is that, look, it might be a fantastic idea, the idea of updating these automatically instead of having to buy a new game every year. I think that's a fantastic idea. But what is the technological improvement that occurs? How is it more than just an idea? I'm going to now send downloads to make sure that the character is more current with what's happening in real time. How is that a technological advantage as opposed to just an abstract idea? Your Honor, you can even take out the downloading step or switch it to be a person doing it. That's not the solution to the problem. The solution is the parameters, and those parameters are particularly configured. The parameter is a component of the video game. It dictates how the video game works, and those are unique and novel and different in this case. I'd also like to just briefly cover the idea that updating a sports video game, that that's what the court held was an abstract idea, and that that isn't similar to any of the cases that this court has previously determined to be abstract or the Supreme Court. It's not related to information gathering or organizing human behavior. And at the second step, I think the court erred in not addressing the performance parameter step just like they failed to do so in the first step with regard to abstract ideas. I see I'm out of time. Thank you. Thank you. The case is submitted.